UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RENEE MINISTERI, *Personal Representative of the Estate of Anthony Ministeri*,<br><br>    Plaintiff,<br><br>v.<br><br>RELIANCE STANDARD LIFE INSURANCE COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil No. 18-10611-LTS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER ON THE PARTIES'
CROSS MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 31 & 34)

February 10, 2021

SOROKIN, J.

　　In this action, Plaintiff Renee Ministeri claims the proceeds of a life insurance policy purchased by her late husband from Defendant Reliance Standard Life Insurance Company. Before the Court are the parties' cross motions for summary judgment. For the reasons which follow, Mrs. Ministeri's Motion for Summary Judgment (Doc. No. 31)[1] is ALLOWED and Reliance's Cross Motion for Summary Judgment (Doc. No. 34) is DENIED.

I.　　BACKGROUND

　　A.　　Factual Background

Anthony Ministeri was hired by AECOM Technology Corporation on April 1, 2014 to

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header. Citations to "AR__" reference pages of the administrative record. Doc. No. 42.

work part time (twenty-four hours per week) as a Construction Services Executive[2] with an annual salary of $156,000. AR0142–43; AR1984. According to his job description, Mr. Ministeri's work mostly involved travel, networking, and giving presentations to large groups. AR0209–10. As part of his employment package, Mr. Ministeri was eligible to receive both basic and supplemental life insurance coverage through a group policy administered by Reliance. AR0142. Mr. Ministeri opted for basic and supplemental coverage, resulting in a total amount of $1,092,000 in life insurance. Doc. No. 49 ¶ 8.

On May 2, 2014, Mr. Ministeri was on a business trip to New York City when he became disoriented and was unable to find his way to his hotel room. Id. ¶ 9. On May 7, 2014, an MRI of Mr. Ministeri's head revealed a lesion in his brain and he was hospitalized for two nights until his initial neuro-oncology consult on May 9, 2014. Id. ¶ 10; AR0514. Mr. Ministeri's medical chart notes that he had been "feeling completely normal" until suddenly becoming disoriented in New York City and had continued to intermittently experienced similar episodes of confusion, incoordination, and dizziness since returning home. AR0514. Following his initial consult, Mr. Ministeri returned to the hospital on May 12, 2014 and May 21, 2014 to undergo brain biopsies. AR551. These revealed he had developed a glioblastoma, a particularly aggressive type of brain tumor. AR551, AR562, AR371; Doc. No. 49 ¶¶ 11–12.

Mr. Ministeri began a course of radiation and chemotherapy treatment which concluded in July 2014. AR0213. All agree Mr. Ministeri remained employed by AECOM during this period and that he did some amount of work for the company from his home. Doc. No. 33-10 at 4; AR215. Following his final chemotherapy appointment, Mr. Ministeri met with Dr. Elizabeth J. Collins on July 31, 2014 to discuss his prognosis. AR0213. He stated his chemotherapy

---

[2] AECOM's internal documents also sometimes refer to Mr. Ministeri as a "Market Sector Regional Executive." See AR0209. Neither party has suggested the difference is material.

treatment had "definitely worked because he [felt] much better." AR0214. Dr. Collin's notes record that Mr. Ministeri was upbeat and that he explained he had "been doing some work from home online" and was looking forward to becoming "more active," although he recognized it would be some time before he could resume his regular schedule of business trips. AR0215. When asked about his cognitive ability, Mr. Ministeri reported he felt "a little bit slow in the uptake," explaining that "cognitively he [was] there, but sometimes [was] not as quick as he had been" before the onset of symptoms in May. AR0215.

Roughly a week later, Mr. Ministeri was discovered unconscious by his wife after suffering a thrombosis, or massive pulmonary embolism. AR0449; AR0464. Although he survived due to Mrs. Ministeri's swift action and the efforts of the medical personnel at Anna Jaques Hospital, Mr. Ministeri was left severely disabled and unable to work. He formally took leave from his role at AECOM effective August 8, 2014, AR1044, and applied for Long Term Disability ("LTD") Benefits under a separate policy issued by Reliance, which the insurer approved after determining that Mr. Ministeri's last day at AECOM was August 6, 2014. AR1445. Mr. Ministeri passed away just over one year later, on October 2, 2015. Doc. No. 49 ¶ 29.

B.    Terms of the Group Policy

1.    *Eligibility Criteria*

Coverage under the RSL Employer Trust Agreement (the "Group Policy") is limited to "Eligible Classes," defined as "Each Active Full-time and Fixed Part-time Corporate Vice President and above of AECOM Technology Corporation." AR0007. The term "Corporate Vice President" is not defined. Id. Nor is the term "Active." Id. The terms "Full-time" and "Part-time" are defined as follows:

> "Full-time" means working for [AECOM] for a minimum of 20 hours during a
> person's regularly scheduled work week.

"Part-time" means working for [AECOM] for a minimum of 20 hours during a person's regularly scheduled work week.

AR0009.[3]

The Group Policy does not define "regularly scheduled work week."

> 2.   *Termination and Continuation Provisions*

An individual's insurance under the Group Policy terminates on "the date the

Insured ceases to be in a class eligible for this insurance." AR0014. Notwithstanding this,

the Group Policy allows for an individual who has been "terminated" to retain coverage

under the Group Policy's "continuation provision." This provision reads:

> The insurance of an Insured may be continued, by payment of premium, beyond the date the Insured ceases to be eligible for this insurance, but not longer than:
>
> > (1) twelve (12) months, if due to illness or injury; or
> > (2) three (3) months, if due to temporary lay-off or approved leave of absence; or
> > (3) one hundred twenty (120) days, if due to a furlough.

AR0015.

> 3.   *Conversion and Portability Provisions*

Individuals who are no longer eligible under the Group Policy may also "convert"

elements of their coverage under the Group Policy into an individual life insurance policy

pursuant to the "conversion provision." The provision begins "An Insured can use this privilege

when his/her insurance is no longer in force" and continues:

> If the insurance ceases due to termination of employment or membership in any of the Participating Unit's classes, an individual Life Insurance Policy may be issued. The Insured is entitled to a policy without disability or supplemental benefits. A written application for the policy must be made by the Insured within sixty (60) days after he/she terminates. The first premium must also be paid within that time.
> . . .

---

[3] The two definitions are in fact identical.

4

> If an Insured dies during the time . . . in which he/she is entitled to apply for an individual policy, we will pay the benefit under the Group Policy that he/she was entitled to convert. This will be done whether or not the Insured applied for the individual policy.

AR0016.

This provision further requires that an Insured be notified of their right to convert, stating,

as relevant here:

> If an Insured is entitled to have an individual policy issued to him/her without proof of health, then he/she must be given notice of this right at least fifteen (15) days before the end of the period specified above. Such notice must be: (1) in writing; and (2) presented or mailed to the Insured by [AECOM[4]]. If not, the Insured will have an additional period in order to do so.

Id.

The Group Policy also contains a separate "portability provision" which allows

individuals to maintain, subject to certain conditions, their supplemental insurance coverage even

after ceasing to be a member of an Eligible Class. That provision reads:

> An Insured may continue Supplemental Insurance coverage under this Policy if coverage would otherwise terminate because he/she ceases to be an Eligible Person . . . provided he/she:
> (1) notifies us in writing within sixty (60) days from the date he/she ceases to be eligible; and
> (2) remits the necessary premiums when due; and
> (3) is not approved for extension of coverage under the Waiver of Premium in Event of Total Disability provision, if applicable; and
> (4) has not been terminated under the Waiver of Premium in Event of Total Disability provision, if applicable, and
> (5) has been covered for twelve (12) months under this Policy and/or the prior group life insurance policy.

> The amount of Supplemental Insurance coverage available under the Portability provision will be the current amount of coverage the Insured and that of his/her insured Dependents, if any, is insured for under this Policy on the last day he/she was Actively at Work. However, the amount of coverage will never be more than:

> (1) the highest amount of life insurance available to Eligible Persons; or

---

[4] Although the Group Policy places this burden on AECOM, Reliance executed a separate agreement in which it agreed to provide notice on AECOM's behalf. AR1979.

(2) a total of $500,000 from all RSL group life and accidental death and dismemberment insurance combined, whichever is less.

AR0025.

C.    Mrs. Ministeri's Claim and Reliance's Denial

Mrs. Ministeri filed a proof of claim with Reliance in April of 2016, in which she sought the proceeds of her husband's basic and supplemental life insurance coverage, for a total of $1,092,000. Doc. No. 33-1.

Reliance denied Mrs. Ministeri's claim in a letter dated July 8, 2016, finding that "no insurance was in force" on the date of Mr. Ministeri's death. Doc. No. 33-10 at 2. In this initial decision letter, Reliance noted the Group Policy limits coverage to AECOM employees who are "Active Full-time [or] Fixed Part-time" and defines "part-time" to mean working for AECOM "for a minimum of 20 hours during a person's regularly scheduled work week." Id. at 3 (alteration in original). Thus, according to Reliance, if Mr. Ministeri "fell below 20 hours of work per week, his insurance under the Policy would terminate as he would no longer be considered 'Part-time.'" Id. Reliance highlighted that "Mr. Ministeri's job consisted primarily of business travel" and, after examining the administrative record, concluded Mr. Ministeri would have been physically unable to travel at any point after his May 2, 2014 business trip. Id. 3–4. Although Reliance recognized Mr. Ministeri had been "performing some work at home" during this period, id. at 4, the company concluded he "dropped below 20 hours of work per week (and his coverage under the Policy . . . terminate[d]) at the point at which he was no longer able to travel," id. at 3, meaning he ceased to be a member of an Eligible Class "no later than the conclusion of his May 2, 2014 business trip" to New York City, id. at 4. As a result, Mr. Ministeri's coverage under the continuation provision "terminated on or about May 2, 2015" meaning he was uninsured on the date of his passing. Id.

6

Mrs. Ministeri appealed this initial determination, which was upheld by Reliance in its final determination letter, dated January 6, 2017. Doc. No. 33-11. In that letter, Reliance acknowledged the administrative record contained some evidence suggesting Mr. Ministeri continued to work from home after his initial diagnosis. Id. at 3–4. But Reliance also noted that Mr. Ministeri was hospitalized at Beth Israel Hospital on May 7, 2014 for two days and returned for a brain biopsy on May 12, 2014, after which he was again kept overnight for observation. Id. at 5–6. Reliance reasoned that "during the [weeks] ending May 9, 2014, and May 16, 2014, Mr. Ministeri clearly did not work 20 hours, given the serious nature of his condition and diagnostic work-up." Id. at 6. Reliance continued: "As [Mr. Ministeri] did not work a minimum of 20 hours, he failed to meet the Policy's definition of *Part-time* and was thusly no longer a member of an *Eligible Class*." Id. Finally, Reliance analyzed whether Mr. Ministeri had satisfied the requirements for being reinstated into coverage under the Group Policy. Finding that he had not, Reliance concluded Mr. Ministeri was not insured when he died. Id. at 6–7.

D.       Procedural Background

Mrs. Ministeri filed suit against AECOM and Reliance on March 29, 2018, primarily alleging wrongful denial of benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The Court dismissed AECOM as a party on September 10, 2019. Doc. No. 17 at 11–13.

Mrs. Ministeri moved to expand the administrative record through discovery on February 4, 2020. Doc. No. 21. The Court originally allowed her Motion as unopposed. Doc. No. 22. Reliance then filed a Motion for Reconsideration, explaining it had good cause for missing the opposition deadline and representing to the Court that the administrative record was complete. Doc. No. 23 at 1–2. The Court allowed Reliance's Motion for Reconsideration and denied Mrs.

Ministeri's Motion for Discovery. Doc. No. 24.

On May 1, 2020, Mrs. Ministeri moved for summary judgment on the administrative record before Reliance at the time it denied her claim. Doc. No. 31. Reliance then filed its own Cross Motion for Summary Judgment on June 1, 2020. Doc. No. 34. The motions are fully briefed and the Court heard argument on January 22, 2021.

II.   LEGAL STANDARDS

The standard of review in an ERISA case differs from review in an ordinary civil case, where summary judgment serves as a procedural device to screen out cases that present no trial-worthy issues. See Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002); Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005); Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006); cf. Fed. R. Civ. P. 56. Because the focus of the court's review in an ERISA case is the final administrative decision, "the district court sits more as an appellate tribunal than as a trial court." Leahy, 315 F.3d at 18. "In the ERISA context, summary judgment is merely the vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." Bard, 471 F.3d at 235 (citation and internal quotation marks omitted).

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court held that judicial review of benefits denial in an ERISA action is de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115. The parties agree the appropriate standard of review in this case is de novo. Doc. No. 32 at 4; Doc. No. 35 at 7.

"[D]e novo review generally consists of the court's independent weighing of the facts and opinions" in the administrative record. Orndorf, 404 F.3d at 518. The Court owes no deference to

the insurer's interpretations or conclusions. See Adele E. v. Anthem Blue Cross, 183 F. Supp. 3d 173, 181 (D. Me. 2016). In other words, the Court "stand[s] in the shoes of the administrator to determine whether the administrative decision was correct." Richards v. Hewlett–Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010) (citation and internal quotation marks omitted). The plaintiff bears the burden of showing by a preponderance that they are entitled to the benefits they seek. See Orndorf, 404 F.3d at 518; Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 83 (1st Cir. 2010). The First Circuit has indicated that under de novo review the terms of the governing insurance policy "must be strictly construed against the insurer and in favor of the insured." Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 93 (1st Cir. 2008).

III.   DISCUSSION

Mrs. Ministeri brings this action as personal representative of the estate of her husband pursuant to Sections 502(a)(1)(B) and (a)(3) of ERISA. Section 502(a)(1)(B) provides a cause of action for a plan participant "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Mrs. Ministeri claims her husband worked for AECOM until suffering a pulmonary embolism in early August 2014 and continued to be insured, by payment of premium, upon his death on October 2, 2015. Reliance responds that Mr. Ministeri ceased working for AECOM several months earlier than Mrs. Ministeri claims, meaning the post-termination coverage period provided for by the Group Policy expired prior to his death. Reliance also argues—for the first time—that certain provisions of the Group Policy limit Mrs. Ministeri's recovery to, at most, the amount payable under her husband's basic life insurance coverage.

A.     Mr. Ministeri was a Member of an Eligible Class Until August 8, 2014

By the terms of the Group Policy, an employee remains a member of an "Eligible Class" so long as they are: (1) an "Active . . . Fixed Part-time" employee, and (2) an AECOM "Corporate Vice President" or above. AR007. The Court finds Mr. Ministeri satisfied both criteria until he formally took leave from AECOM on August 8, 2014.

1.     *Mr. Ministeri was an "Active . . . Fixed Part-time" Employee Until August 8, 2014.*

The Court begins by determining what it means to be an "Active . . . Fixed Part-time" employee within the meaning of the Group Policy. AR007. The Group Policy does not define "Active"[5] or "Fixed" but does define "Part-time" to mean "working for [AECOM] for a minimum of 20 hours during a person's regularly scheduled work week." AR009. Pointing to this definition of "Part-time," Reliance argues an employee is only eligible so long as they work a minimum of twenty hours each and every week. Doc. No. 35 at 9; Doc. No. 47 at 4. The Court disagrees. For the reasons which follow, the Court concludes an "Active . . . Fixed Part-time" employee is one who regularly works twenty hours a week, rather than one who works twenty hours every single week.

Other courts have interpreted nearly identical language in policies issued by Reliance and their views, while not binding on this Court, are nonetheless instructive. In Tester v. Reliance Standard Life Insurance Co., 228 F.3d 372 (4th Cir. 2000), the Fourth Circuit considered

---

[5] Elsewhere, the Group Policy requires that an employee who loses eligibility return to "active work" before they are reinstated into the Group Policy, and the Group Policy defines the terms "active work" and "actively at work" to mean "actually performing . . . each and every duty pertaining to his/her job in the place where and the manner in which the job is normally performed." AR0009; AR0015. However, the parties agree the definitions of "active work" and "actively at work" do not shed light on the meaning of the term "Active." See Doc. No. 35 at 14; cf. Tester v. Reliance Standard Life Ins. Co., 228 F.3d 372, 376 (4th Cir. 2000) (refusing to use the definition of "active work" to define "active" while interpreting substantively similar policy language).

whether an employee who had not worked for over a month due to certain health problems, but nonetheless remained employed by her company, was an "active, Full-time" employee. Id. at 373–75. Reliance pointed out the policy defined "Full-time"[6] to mean working "a minimum of 20 hours during [the] person's regularly scheduled work week," id. at 374, and argued the policy should be interpreted to require that employees work a minimum number of hours each and every week to maintain their eligibility. See id. at 376. The Fourth Circuit refused to read the policy so narrowly, as it would defeat the reasonable expectations of the insured. The Fourth Circuit believed Reliance's interpretation would "lead to absurd results," noting:

> [U]nder Reliance's interpretation of the policy an employee who works two eight-hour days and then dies in an automobile accident on route to work would not be covered because he . . . . died from an accident a few hours short of completing his mandatory   20–hour   work   week   .   .   .   .

Id. at 376.

Concluding the eligibility provision was ambiguous, the Fourth Circuit construed that ambiguity against the drafter and held the insured was eligible under the policy so long as "she worked [for her employer] on a regular basis despite her sick leave." Id. at 377. Because the insured had not been terminated from her position and was still considered an employee by her employer (albeit one on leave for over a month), the Fourth Circuit concluded that she was an "active, Full-time" employee within the meaning of the policy and therefore covered when she died. See id.; see also Carlile v. Reliance Standard Ins. Co., 385 F. Supp. 3d 1180, 1186–88 (D. Utah 2019) (appeal pending) (expressly adopting the rationale of Tester in holding in the alternative that, under a substantively identical policy, it would be an "absurd result" to deny coverage to an employee who could not prove he had worked a minimum number of hours

---

[6] The Court's discussion in Tester assumes that the insured was a full-time employee while all agree Mr. Ministeri worked for AECOM part time. The difference is not material.

during the weeks in question).

Practically identical policy language was again considered in <u>Campos v. Reliance Standard Life Insurance Co.</u>, No. 2:15-cv-08304-ODW, 2017 WL 1370691 (C.D. Cal. April 12, 2017). There, the policy defined "Full-time" to mean "working . . . 30 hours during [the employee's] regular work week." <u>Campos</u>, 2017 WL 1370681, at *1–2, *4. At issue was whether an employee who worked an irregular schedule, sometimes below thirty hours and sometimes above thirty hours, was an "active, Full-time Employee" within the meaning of the policy. Once again, Reliance argued the language of the policy required that an insured work a minimum number of hours each and every week to maintain eligibility. <u>Id.</u> at *2. The <u>Campos</u> Court rejected this. The Court noted the language of the policy required that employees work a minimum of thirty hours in their "regular work week," not every week as Reliance argued. <u>Id.</u> at *4. To determine the number of hours the claimant worked in a "regular work week," the Court calculated the average number of hours they worked across weeks and, on that basis, found the employee was an "active, Full-time Employee." <u>Id.</u>

Reliance points to several precedents which, it claims, support a narrower interpretation of the Group Policy. But these authorities are inapposite as each involves materially different language from the policy currently under consideration. In <u>Turner v. Safeco Life Insurance Co.</u>, 17 F.3d 141 (6th Cir. 1994), the policy spelled out that the insured must work "a minimum of 30 hours <u>each</u> week"—side-stepping the ambiguity at issue here. <u>Turner</u>, 17 F.3d at 144 (emphasis added). The same is true of <u>Jones v. Unum Provident Corp.</u>, 596 F.3d 433, 437 (8th Cir. 2010) (policy defined "full-time" as "working at least 30 hours per week"). Reliance's emphasis on <u>Elsey v. Prudential Insurance Co. of America</u>, 262 F.2d 432 (10th Cir. 1958), is also misplaced. There, all agreed the employee was not "actively at work" within the meaning of the policy—the

only question was whether the employee's failure to satisfy this condition was material. Id. at 434. Burnham v. Guardian Life Insurance Co. of America, 873 F.2d 486 (1st Cir. 1989), is even further afield given that the First Circuit's analysis expressly avoided the question currently facing the Court. See Burnham, 873 F.2d at 488–90 (prefacing its analysis by assuming "arguendo that [the employee] was 'work[ing] at least 30 hours per week'" (second alteration in original)).

In summary, courts faced with practically identical eligibility language have rejected Reliance's arguments that employees must work a set number of hours each week to maintain eligibility. The Court finds these cases persuasive. As recognized in Tester, the term "active" is ambiguous and Reliance's narrow interpretation of the definition of "part-time" would lead to the absurd result that employees could lose eligibility after missing a single day (or even a few hours) of work. Tester, 228 F.3d at 374, 376–77.[7]

What's more, the Campos Court is correct that, absurdity aside, the text of the Group Policy forecloses Reliance's proffered interpretation. The Group Policy defines "Part-time" as working "for a minimum of 20 hours during a person's regularly scheduled work week." AR0009 (emphasis added). Reliance asks the Court to simply ignore the words "regularly scheduled work week" and interpret the text as though it read "for a minimum of 20 hours each week." But that is not the policy Reliance negotiated for and "contracts should be construed to give effect to every word, clause, and phrase." Crowe v. Bolduc, 365 F.3d 86, 97 (1st Cir. 2004).

---

[7] The Court recognizes that here, unlike in Tester, an employee who missed a brief stretch of work might retain coverage for up to twelve months under the Group Policy's continuation provision. But this continuation coverage is only temporary. Thus, an employee who missed one day of work might still suddenly find themselves without coverage a year later if they failed to satisfy the strict terms of the Group Policy's reinstatement provisions. AR009; AR0014. One need not invoke the current pandemic to imagine situations in which an employee might work from home or be assigned new job duties— circumstances which would render them ineligible for reinstatement and, under Reliance's interpretation, cost them their coverage.

The Group Policy does not define the term "regularly scheduled work week," but one dictionary defines "regular" to mean, among other things, "recurring, attending, or functioning at fixed, uniform, or normal intervals." <u>Campos</u>, 2017 WL 1370691, at *3 (quoting Regular, <u>Merriam-Webster's Dictionary</u>, https://www.merriam-webster.com/dictionary/regular (last visited April 10, 2017)). The number of hours an employee works in their "regular work week" is therefore the number of hours they work on a "recurring" or "normal" basis. At the very least, the meaning of "part-time" is ambiguous and the Court must construe any ambiguity against the drafter. <u>See</u> <u>Stamp</u>, 531 F.3d at 93.

For these reasons, the Court concludes that an "Active . . . Fixed Part-time" employee is one who regularly works a minimum of twenty hours a week rather than one who works a minimum of twenty hours each and every week. Applying this standard to the administrative record, the Court finds Mr. Ministeri regularly worked a minimum of twenty hours a week until he formally took leave from AECOM on August 8, 2014.

The record contains considerable evidence that Mr. Ministeri continued to work for AECOM during the period between his initial episode of disorientation in New York City on May 2, 2014 and his pulmonary embolism on August 10, 2014. AECOM's records show Mr. Ministeri remained employed by the company in his role as a Construction Services Executive and continued to receive his annual salary of $156,000 until he formally took leave in August 2014. AR1032–42. Mr. Ministeri's timesheets (approved by his manager) show he worked twenty-four hours each week until that date. Doc. No. 49 ¶ 22; AR1016–29. And Mr. Ministeri's medical records reflect that he made a contemporaneous statement to his healthcare provider on July 31, 2014 (before his pulmonary embolism) that he had been working from home during the course of his treatment. AR0215.

14

During Reliance's investigation of Mrs. Ministeri's claim, they contacted AECOM to confirm when Mr. Ministeri stopped working for the company. Reliance's primary contact was Peggy Larsen, who works in AECOM's Benefits Division in California. On May 20, 2016, in response to an inquiry from Reliance, Larsen explained that Mr. Ministeri continued to work for AECOM after his initial diagnosis and that "the first day he was unable to perform his full job duties was 8-8-2014." AR1468. On May 27, 2016, Reliance reached out to Larsen again with further questions. In response, Larsen confirmed that Mr. Ministeri continued to work "his regular scheduled hours of 24 per week" through August 8, 2014. AR1465. On June 16, 2016, in response to further questions, Larsen once again confirmed to Reliance that "Mr. Ministeri never dropped below 20 hours per week" and had "continued to work his full schedule of 24 hours through 8-8-2014." AR0958.

On August 10, 2016, Larsen reached out to Reliance on behalf of AECOM with further evidence. AR1044. Her email, which once again confirmed Mr. Ministeri had continued to work for AECOM until August 8, 2014, included two attachments. The first was Mr. Ministeri's timesheets which, as noted above, show he worked twenty-four hours per week during the relevant period. Doc. No. 49 ¶ 22; AR1016–29. The second attachment was a statement from Brian O'Kane, an AECOM Executive Vice President, which reads:

> As Anthony Ministeri's manager, for the time period of April 1, 2014 – August 8, 2014, I did approve his timesheets. Anthony, once diagnosed did need treatments, which interfered with his ability to travel on the job. However, he worked from home during this timeperiod. He was able to maintain a part time work schedule around his treatments and doctor's visits.

AR1044.

In response to a request from Reliance that AECOM describe the work Mr. Ministeri had performed during this period, O'Kane wrote:

15

> Anthony assisted on three critical proposal efforts. His main responsibility was to draft the strategy for implementation and staffing. The three proposals were the following:
>
>> TIAA CREF Phase 2 second year costing model.
>> GE CM cost model.
>> Verizon CM model execution and scoping.
>
> He also reviewed numerous pricing models and staffing charts with me over the phone.

Id.

Reliance argues the evidence provided by AECOM should not be taken at face value. Although Reliance does not deny that AECOM continued to employ Mr. Ministeri, approve his timesheets, and pay him an annualized salary of $156,000, Doc. No. 35 at 11–12, Reliance suggests AECOM did so as an act of charity and describes the company's repeated representations that Mr. Ministeri worked until August 2014 as "obviously erroneous," Doc. No. 35 at 12. Reliance offers four arguments to support this position.

First, Reliance points to apparent conflicts between Mr. Ministeri's timesheets and his medical records. As Reliance points out, Mr. Ministeri's timesheets report he worked on days when his medical records show he was either unable to work or otherwise occupied with medical appointments. But reviewing the timecards, it is clear Mr. Ministeri habitually entered eight hours into the same three days each week (Monday, Tuesday, and Wednesday), and that this had been his practice since he was first hired at the company (i.e. before the onset of his illness). See AR1011–31. The record amply demonstrates that Mr. Ministeri did not keep careful track of his time. For example, all agree Mr. Ministeri was on an out-of-state business trip for AECOM on May 2, 2014, but his timesheets indicate he did not work a single hour between May 1, 2014 and May 4, 2014—presumably because none of these dates were a Monday, Tuesday, or Wednesday. AR1015–16. Mr. Ministeri was a high-level employee at AECOM, and it is perhaps unsurprising

16

that he was not required to keep careful track of his hours. The Court attaches minimal weight to the conflicts identified by Reliance and attaches significant weight to the fact AECOM continued to approve Mr. Ministeri's timesheets in the same manner as before the illness and pay his salary during this period. See Stephens v. Citation Corp., 705 F. Supp. 2d 1291, 1302 (finding employee was "active, full-time" in part because his employer continued to pay his salary and benefits).

Second, Reliance points to a statement made by Larsen who, when asked whether Mr. Ministeri was "able to perform his duties as a Construction Service Executive from [h]ome," responded:

> Mr. Ministeri was not able or expected to perform his job at home, as the job required regular and frequent travel . . . . While all execs perform some work at home between meetings . . . Mr. Ministeri was not working from home any more than other Business Executives.

AR1466.

As Reliance stresses, Larsen's representations in this email contradict the above quoted statement from O'Kane, Mr. Ministeri's supervisor, who told Reliance that Mr. Ministeri was working from home. From this conflict, Reliance concludes that AECOM falsely represented Mr. Ministeri continued to work for the company during his chemotherapy treatment. But it is a long leap—too long—from this minor discrepancy to Reliance's conclusion that Larsen, O'Kane, and everybody else at AECOM was lying. At best, Reliance has shown some ambiguity in this statement from Larsen, best understood in light of the factual record, as making clear that Mr. Ministeri no longer traveled so his role had shifted. Larsen repeatedly told Reliance that Mr. Ministeri continued to work twenty-four hours per week during the relevant period, AR1473–74; AR0958, AR1223, AR1467, which is consistent with O'Kane's statements and with Mr. Ministeri's timesheets.

Third, Reliance points to a statement Mr. Ministeri made on January 16, 2015 (after his embolism) during an interview with the Social Security Administration. Doc. No. 35 at 10. During this interview, Mr. Ministeri reported he had become unable to work on April 10, 2014, AR0614, which—if true—would render him ineligible to recover under the Group Policy. But this statement deserves no weight. By the time of his interview, Mr. Ministeri had entered the advanced stages of his battle with brain cancer and, additionally, had suffered a permanently debilitating pulmonary embolism. The interviewer noted in his report that Mr. Ministeri had difficulty answering questions and that he "forgot names and dates." AR0624. Indeed, Reliance acknowledges the April 10, 2014 date offered by Mr. Ministeri was "clearly a mistake," Doc. No. 35 at 10, as all agree Mr. Ministeri continued to work until at least May 2, 2014. Mr. Ministeri was simply confused when he offered the April 10, 2014 date and the Court therefore attaches no weight to the statement.

Finally, Reliance argues the symptoms Mr. Ministeri experienced as a result of his cancer render it implausible that he worked after May 2, 2014. There is certainly evidence in the record to support the conclusion that Mr. Ministeri's condition impeded his ability to work. When Mr. Ministeri was first hospitalized after his New York City business trip, he reported having "increased difficulty performing [his] usual activities" and "difficulty maintaining his focus when he works on the computer." AR0304. Mr. Ministeri also reported periods of disorientation, explaining he had "episodes when he tried to put his shirt on backwards and when he would put the wrong shoe on the wrong foot." Id. Two weeks later, he reported he "had some difficulty typing memos, occasionally typing gibberish" and that he had become clumsier. AR0498.

However, these reports of impairment all stem from when Mr. Ministeri was first diagnosed in May of 2014. From the record, it appears Mr. Ministeri's condition improved with

treatment, prior to his suffering an unexpected pulmonary embolism in August of 2014. During a medical appointment in July, Mr. Ministeri reported his treatment had "definitely worked because he [felt] much better." AR0214. He explained that "he still [felt] a little bit slow in the uptake in his brain" but that "cognitively he [was] there" even if sometimes "not as quick as he had been." AR0215. As noted earlier, he also confirmed to his doctor that he had been working from home during the course of his treatment. Id.

Indeed, even Mr. Ministeri's early reports of impairment in May suggest that he continued to work during the period immediately following his initial diagnosis. The bouts of confusion he describes are episodic rather than permanent, meaning he did not suffer total impairment during that period. And his report that he found himself "occasionally typing gibberish" while writing memos implies that he continued to work even as he suffered these occasional episodes of confusion. This evidence that Mr. Ministeri continued to work despite his impairments is, of course, corroborated by AECOM's numerous, specific representations that Mr. Ministeri continued to work during this period. The issue is not whether Mr. Ministeri worked as much or as effectively as prior to his illness, but whether he continued to qualify under the Group Policy. The record establishes that Mr. Ministeri was able to manage these symptoms and continue working within the meaning of the Group Policy until August of 2014.[8]

After considering the administrative record and the language of the Group Policy, the Court finds Mr. Ministeri remained an "Active . . . Fixed Part-time" employee until August 8,

---

[8] Reliance also argues that, given the sheer number of medical appointments Mr. Ministeri had at the beginning of May of 2014, "Mr. Ministeri clearly did not work 20 hours" during "the time periods ending May 9, 2014, and May 16, 2014." AR137. But as explained above, Mr. Ministeri was not required to work a minimum of twenty hours every week to maintain eligibility—he only had to work twenty-hour weeks "regularly." See supra. Thus, even if he had worked less than twenty hours during those two weeks, the record reflects that he remained an "Active . . . Fixed Part-time" employee. In any event, Mr. Ministeri's medical commitments were not as great or as numerous as Reliance suggests.

2014.

> ### 2.  *Mr. Ministeri was a "Corporate Vice President [or] Above" Until August 8, 2014.*

Mr. Ministeri was hired by AECOM to the position of Constructive Services Executive, a title which all agree is a "Corporate Vice President" or higher. He appears to have held that title until at least August 8, 2014. There is no evidence to suggest he received a demotion or lower title, or that he began to be assigned work suitable for employees below the grade of Corporate Vice President. Indeed, the record shows that Mr. Ministeri continued to report to the same supervisor and continued to consult on projects similar in nature to those he had worked on prior to his hospitalization. AR1044. Thus, the Court finds Mr. Ministeri was a Corporate Vice President or higher when he formally took leave on August 8, 2014.

Reliance argues the contrary, positing that Mr. Ministeri could only be considered a "Corporate Vice President" so long as he was "performing the duties of his occupation as a Construction Services Executive." Doc. No. 35 at 8. Because Mr. Ministeri ceased travelling and presenting to large conferences on or about May 2, 2014, and because travel and group presentations are a part of the job description of a Construction Services Executive, Mr. Ministeri was no longer a "Corporate Vice President" (or so the argument goes).

Reliance does not explain why an employee must fulfil the job description of a "Construction Services Executive" to be considered a "Corporate Vice President." There is nothing in the language of the Group Policy to suggest such a requirement and it can reasonably be assumed that a number of AECOM Corporate Vice Presidents do work that is substantially different from the duties of a Construction Services Executive. The Court therefore understands Reliance to be arguing that the "Corporate Vice President" criteria somehow imposes a requirement that employees not deviate from their formal job descriptions, even with their

20

manager's permission. The Court declines to adopt such an interpretation as it is not fairly supported by the text of the Group Policy.

After carefully reviewing the terms of the Group Policy and the administrative record, the Court concludes Mr. Ministeri was a member of an Eligible Class until at least August 8, 2014.

B.    Mrs. Ministeri is Entitled to the Proceeds of her Husband's Basic Life Insurance Coverage

Mr. Ministeri died on October 2, 2015, nearly (but not quite) fourteen months after his last day of work for AECOM. The Group Policy's continuation provision entitles an insured to continued coverage for twelve months after they cease to be a member of an Eligible Class. AR0015. Separately, the conversion (not continuation) provision entitles an insured to collect the proceeds of their basic life insurance if they died within two months of the point at which their "insurance is no longer in force." AR0016. As explained in Mrs. Ministeri's opening brief, the continuation and conversion provisions work together, in effect, to allow an employee to collect basic life insurance proceeds if they die within "fourteen months after he or she stop[s] working, provided that premiums were paid." Doc. No. 32 at 3–4. Because Mr. Ministeri remained a member of an Eligible Class until August 8, 2014, he retained coverage under the continuation provision through August 8, 2015. All agree Mr. Ministeri continued to pay premiums. His death less than two months later therefore entitles Mrs. Ministeri to the benefit of her husband's basic life insurance coverage under the terms of the conversion provision.

Reliance's decision letters do not address Mr. Ministeri's coverage under the conversion provision and, in this respect, are facially deficient. The conversion provision allows policy holders to "convert" their basic life insurance coverage into an individual insurance policy if they: (1) cease to be a member of an Eligible Class; (2) continue to remit premium payments, and; (3) apply for conversion within sixty days of termination from coverage. AR0016. If an

insured meets these conditions (or dies within the sixty-day notice period) their basic life insurance coverage remains in effect.

Under Reliance's theory of the case in litigation, Mr. Ministeri's failure to provide notice under this provision was a necessary condition to Reliance's decision to deny Mrs. Ministeri the proceeds of his basic life insurance coverage. By failing to address this in its decision letters, Reliance failed to provide Mrs. Ministeri with a complete explanation of its denial of her claim, in violation of ERISA and its implementing regulations. See Bard, 471 F.3d at 237 (noting "[t]he need for clear notice pervades the ERISA regulatory structure").

The Court need not belabor Reliance's procedural failing because, in any event, Mrs. Ministeri is entitled to the proceeds of her husband's basic life insurance coverage. All agree Mr. Ministeri satisfied the first two conditions for eligibility under the conversion provision as he (1) ceased to be a member of an Eligible Class and (2) continued his coverage by payment of premium. And his death on October 2, 2015 waived the notice requirement, automatically entitling Mrs. Ministeri to basic life insurance proceeds.

Reliance agreed in briefing the conversion period ran until "sixty days after the individual insurance terminates," Doc. No. 35 at 19, and conceded that Mrs. Ministeri would be entitled to the basic life insurance proceeds if it were "proven that [her husband] was working in August 2014." Doc. No. 47 at 13. This concession is unsurprising. It mirrors the express written position taken by Reliance in its final denial letter, in which it noted that Mr. Ministeri's basic life insurance would have expired fourteen months after his last day of work, i.e. after both the twelve month continuation period and the two month conversion period. Doc. No. 31-11 at 7 ("By payment of premium, Mr. Ministeri's coverage was then continued [for fourteen months] to July 2, 2014, or July 9, 2014, at the latest." (footnote omitted)). Notwithstanding these express

concessions that the two periods run consecutively, Reliance orally advanced a new interpretation at the motion hearing, arguing the two-month conversion period began to run when Mr. Ministeri ceased to be a member of an eligible class—back in August 2014 (or May 2014 under Reliance's view).[9] Reliance has waived this argument. Reliance failed to raise it in its decision letters, during discovery, or in its briefs. Indeed, Reliance has repeatedly asserted the directly contrary position in its decision letters and briefs. "As the First Circuit has held—albeit in the criminal context—'except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived.'" U.S. ex rel. Dyer v. Raytheon Co., No. Civ. 08-10341-DPW, 2013 WL 5348571, at *25 (D. Mass. Sept. 23, 2013) (quoting United States v. Giggey, 551 F.3d 27, 36–37 (1st Cir. 2008)). This is not an extraordinary circumstance. Indeed, the equities weigh against Reliance because its new argument directly contradicts a number of statements it has made to the Court. Parties adopt contradictory positions before the Court at their peril. See Patriot Cinemas, Inc. v. Gen. Cinemas Corp., 834 F.2d 208, 212 (1st Cir 1987) (cautioning litigants in a related context against "playing fast and loose with the courts").

    Even if the Court were to consider Reliance's new argument, it would fail. The text of the conversion provision begins with the statement: "An Insured can use this [provision] when his/her insurance is no longer in force." AR0016. Reliance points out "Insured" is defined by the Group Policy to mean "a person who meets the eligibility requirements of the Policy and is enrolled for this insurance." AR0009.[10] Because Mr. Ministeri was no longer a member of an

---

[9] When asked by the Court, counsel for Reliance candidly confessed he did not know whether Reliance had raised this argument in its briefs. The Court notes that argument counsel only appeared in the case after the Court set the motion hearing and did not sign any of Reliance's summary judgment briefs. Doc. No. 51.

[10] Reliance also pointed to the next paragraph, which states the insured must make a written application for conversion "within sixty (60) days after he/she terminates," id., arguing "terminates" should be

Eligible Class when his continuation coverage expired in August 2015, Reliance argues he was not an "Insured" and therefore not eligible to invoke the conversion provision. But this interpretation is not compelled by the definition of "Insured" and runs straight into the conversion provision's unambiguous directive that it may only be invoked "when [a participant's] insurance is no longer in force." Id.

Reliance's interpretation would essentially read the entire conversion provision out of the contract. It would mean the opening sentence of the provision both requires insureds to invoke the conversion provision prior to losing their coverage while simultaneously providing they may only invoke its terms once their "insurance is no longer in force"—placing insureds in an impossible double bind. The facts of Mr. Ministeri's claim illustrate the absurdity. Reliance now argues he should have "converted" in late 2014 but all agree (including Reliance) that his insurance remained "in force" through the continuation provision until mid-2015. Under Reliance's new interpretation, there was no point at which Mr. Ministeri could have validly converted his insurance; he was always either too early or too late. It is perhaps for these reasons that Reliance, see AR1445 (internal email assuming the provisions run consecutively); Doc. No. 31-11 at 7 (final decision letter stating same), and its attorneys in written filings with the Court, see supra, have repeatedly interpreted the conversion provision as being triggered once "insurance terminates," Doc. No. 35 at 19. Mr. Ministeri died within sixty days of the termination of his insurance, entitling Mrs. Ministeri to the proceeds of his basic life insurance policy.

---

understood to mean "terminates from eligibility." But the term "terminates" is ambiguous and, indeed, is used throughout the Group Policy to mean "terminates from insurance." See, e.g., AR0022 ("[A]fter a prior termination of insurance . . . ."); id. (section titled "Termination of Dependent Life Insurance" which states "insurance . . . will terminate [under certain conditions]"); AR0025 (allowing invocation of portability provision "if coverage would otherwise terminate").

C.      Mrs. Ministeri is Entitled to the Proceeds of Her Husband's Supplemental Life
        Coverage

Although Mr. Ministeri's coverage under the continuation provision expired on August 8,

2015, the Group Policy allows insureds to continue their supplemental life insurance coverage

under the terms of the portability provision. To qualify, the insured must: (1) have been covered

by the Group Policy for at least twelve months; (2) continue to remit premiums; (3) satisfy

certain criteria relating to disability, and; (4) notify Reliance. All agree Mr. Ministeri satisfied

each of these criteria except possibly the last, which Reliance disputes (Reliance's "notice

Rationale"). In the alternative, Reliance argues the terms of the portability provision, even if it

applicable here, cap Mrs. Ministeri's recovery such that she is unable to claim any supplemental

life insurance benefits (Reliance's "portability cap rationale").[11] Mrs. Ministeri responds that

Reliance has waived these newly asserted rationales by failing to include them in its denial

letters.

### 1.      Reliance's Notice Rationale is Barred

Reliance claims the Ministeris failed to comply with the notice requirement of the

portability provision. Much like the conversion provision described above, the portability

provision allows an insured to continue their supplemental life insurance after it would otherwise

---

[11] At the hearing, Reliance introduced a third rationale, arguing the portability provision's requirement that Mr. Ministeri provide notice within sixty days after he "cease[d] to be eligible" should be read to mean "ceased to be a member of an eligible class." As before, this argument directly contradicts Reliance's express written statements to the Court. See Doc. No. 35 at 21 ("Mr. Ministeri had until [the end of the continuation period] . . . to port the Supplemental insurance."); Doc. No. 47 at 13 (conceding same). This rationale did not appear in Reliance's denial letters or in its briefs and is therefore waived. Dyer, 2013 WL 5348571, at *25. In any event the argument is foreclosed by the Group Policy's text, construed under governing ERISA law. Reading "eligible" to mean "member of an eligible class" overlooks that the Group Policy uses a different term for that purpose. See AR0009 (defining "Eligible Person"). Indeed, "eligible" is often used in the policy to mean "eligible for coverage." See AR0022 (discussing "eligible" dependents); AR0027 (describing a benefit a member of an eligible class may be "eligible" for). At the very least the text is ambiguous, as Reliance's own differing interpretations indicate, and must therefore be construed in Mrs. Ministeri's favor.

expire if, in addition to certain conditions all agree Mr. Ministeri satisfied, the insured provides notice to Reliance within a set period of time. AR0025. Unlike the conversion provision however, the portability provision's notice requirement is not automatically excused by the insured's death. Id.

The Court is unable to determine whether Mr. Ministeri provided timely notice on this record. During the initial adjudication of Mrs. Ministeri's claim, Reliance investigated whether she or her husband had complied with the portability provision's notice requirement. AR0082. Reliance concluded they had not complied, id., but did not inform Mrs. Ministeri of its investigation or of its conclusion. Instead, Reliance's initial and final decision letters denied Mrs. Ministeri's claim solely on the erroneous ground that her husband's last day worked was May 2, 2014. See Doc. No. 33-10; Doc. No. 33-11; see also supra (describing Reliance's denial letters). Because Reliance failed to raise the notice requirement in its letters, Mrs. Ministeri was deprived of the opportunity to present evidence or otherwise "challenge the new reasoning during the administrative process." Bard, 471 F.3d at 244. Nor did Mrs. Ministeri have the opportunity to develop evidence during litigation as Reliance successfully persuaded the Court to deny Mrs. Ministeri's motion for discovery by representing that the administrative record was complete. Doc. No. 23-1 at 1–2. It was only during summary judgment briefing, nearly five years after Mrs. Ministeri initially filed her claim, that Reliance first pointed out the administrative record does not contain evidence of notice.

In Glista v. Unum Life Insurance Co. of America, 378 F.3d 113 (1st Cir. 2004), the First Circuit considered whether insurers should be allowed to raise new rationales for denying benefits during post-determination litigation. The First Circuit noted "[b]oth the statute and the ERISA regulations require that the plan administrator provide a claimant with the specific

reasons for its denial of a claim" in its decision letters. Glista, 378 F.3d at 128. As the Glista

Court explained, insurers who violate these regulations by holding defenses "in reserve" frustrate

the overall purpose of ERISA, which is to "to minimize the number of frivolous lawsuits;

promote consistent treatment of claims; provide a nonadversarial dispute resolution process; and

decrease the cost and time of claims settlement." Glista, 378 F.3d at 129 (quoting Powell v. AT

& T Comm., Inc., 938 F.2d 823, 826 (7th Cir. 1991)); see also Stephanie C. v. Blue Cross Blue

Shield of Mass. HMO Blue, Inc., 852 F.3d 105, 113 (1st Cir. 2017) ("[A] plan administrator, in

terminating or denying benefits, may not rely on a theory for its termination or denial that it did

not communicate to the insured prior to litigation.").

The First Circuit noted that other circuit courts had adopted a "variety" of approaches

when faced with such violations, concluded that "no single answer fits all cases," and stressed

that remand for initial reconsideration by the insurer may often be appropriate. Glista, 378 F.3d

at 130–32. In determining the proper remedy in the case before it, the First Circuit focused on

four factors which persuaded it to bar the insurer's newly raised defense. Id. at 131–32. First, the

court observed, "traditional insurance law places the burden on the insurer to prove the

applicability of exclusions . . . ." Id. at 131 (citations omitted). Second, because the plan at issue

"expressly provide[d]" that participants were to receive the "specific reason or reasons for [a]

denial" of benefits, the insurer "could hardly be caught by surprise by an insistence that it

comply with its own plan." Id. at 132. Third, the insurer had sufficient information before it to

raise the defense earlier and "offered no explanation" for why it had not previously done so. Id.

Finally, the court cited the seriousness of the insured's medical condition which "call[ed] for

resolving this controversy quickly." Id. Subsequent cases applying this holding have emphasized

that a central factor is whether the insurer's failure to timely raise a rationale left the claimant

27

"unable to effectively challenge the new reasoning during the administrative process" or otherwise prejudiced the insured. Bard, 471 F.3d at 244 (using the term "sandbagging"); accord Martinez v. Sun Life Assurance Co. of Canada, 948 F.3d 62, 68 (1st Cir. 2020) ("We typically have only barred a plan from asserting defenses to coverage not articulated to the insured when the lack of notice resulted in prejudice to the insured.").[12]

The Court finds that Reliance's new-found notice rationale violates ERISA and its implementing regulations. As with the conversion provision discussed earlier, Reliance's failure to address the portability provision in adjudicating Mrs. Ministeri's claim for supplemental life insurance proceeds leaves its decision letters facially deficient. Under Reliance's theory of the case, Mrs. Ministeri's alleged failure to provide notice was a necessary condition to its decision to deny her claim. At the motion hearing, Reliance argued it had no obligation to raise its notice rationale in its decision letters because Mrs. Ministeri had not raised that provision in her claim. But this attempt to shift the burden is unconvincing. Once Mrs. Ministeri claimed supplemental benefits, Reliance was required to either allow the claim or explain why it ought to be denied. By not raising the lack of notice in its denial letters, Reliance failed to provide Mrs. Ministeri with a

---

[12] Reliance objected at argument that Glista is inapplicable, asserting waiver may not be used to establish coverage where none exists. The Court understands Reliance to be referring to the state law maxim that, "where the issue is the existence or nonexistence of [insurance] coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable." Juliano v. Health Maint. Org. of N.J., Inc., 221 F.3d 279, 288 (2d Cir. 2000) (quoting New York authority). Like several of Reliance's other arguments at the hearing, this one-sentence oral objection was not briefed and is therefore waived. Dyer, 2013 WL 5348571, at *25. But in any event, Glista was not, strictly speaking, an application of waiver— the First Circuit merely drew on elements of that state law doctrine in fashioning a federal common law remedy for an ERISA violation. See Heller v. Cap Gemini Ernst & Young Welfare Plan, 396 F. Supp. 2d 10, 24–25 (D. Mass. 2005) (distinguishing between Glista and common law waiver in analysis of ERISA claim). The First Circuit has never recognized an exception to its holding in Glista based on state law limitations to waiver. Indeed, the Glista Court itself barred an insurer from raising an exclusionary clause——an impossible result, had it recognized the exception Reliance proposes. Glista, 378 F.3d at 132. Far from being an oversight, that clause's exclusionary nature was one of the very factors the Glista Court pointed to in justifying its decision to bar the new rationale. Id. ("[I]nsurance law places the burden on the insurer to prove the applicability of exclusions . . . .").

complete explanation of its decision as required under ERISA. See Glista, 378 F.3d at 128–29;

see also Bard, 471 F.3d at 237 (noting "[t]he need for clear notice pervades the ERISA

regulatory structure"). Worse still, Reliance seems to have unintentionally misled Mrs. Ministeri

regarding the portability provision's notice requirement by sending a letter to her mistakenly

implying Mr. Ministeri was covered by the Group Policy until after his death. AR1984 (listing

Mr. Ministeri's termination as October 3, 2015). Mrs. Ministeri therefore had little cause to

suspect Reliance may be holding its notice rationale in reserve. True, the error in this letter

appears to be inadvertent. But it nonetheless compounds the harm of Reliance's failure to timely

disclose its notice rationale.

After considering Glista and its progeny, the Court holds the appropriate remedy for

Reliance's violation is to bar it from raising the notice rationale in this proceeding. Reliance's

failure to inform Mrs. Ministeri of this rationale deprived her of a meaningful opportunity to

challenge it. Normally, such a harm could be remedied through remand but that is not enough in

this case because Reliance's delay has engendered detrimental reliance on the part of Mrs.

Ministeri. In her opening brief, Mrs. Ministeri argued for summary judgment on the narrow

theory that her husband had worked until August 8, 2014—an argument the Court found

persuasive. Reliance waited until after she had committed herself to this position before

unveiling its new rationale. Had Reliance timely informed Mrs. Ministeri of its notice rationale,

she may well have adopted a different litigation strategy such as, for example, drawing upon

favorable precedent in Tester, 228 F.3d at 373–77, and Carlile, 385 F. Supp. 3d at 1186–88, to

argue her husband retained eligibility until a later date—avoiding the notice issue altogether.

Were the Court to remand, Mrs. Ministeri would be bound by her earlier arguments (and this

Court's findings) when presenting her claim to Reliance, creating a situation in which Reliance

29

might very well benefit from its failure to comply with ERISA's requirements.

Insurers may not hold rationales in reserve, waiting to spring them upon claimants only after they have adopted a litigation position. See Hatfield v. Blue Cross & Blue Shield of Mass., Inc., 162 F. Supp. 3d 24, 37 (D. Mass. 2016) ("[T]he principle that 'sandbagging' claimants with new rationales is impermissible, given that the 'need for clear notice pervades the ERISA regulatory structure,' is well-established." (quoting Bard, 471 F.3d at 237, 244)). Like the insurer in Glista, Reliance knew of its rationale during the initial adjudicative process and was required to raise it at that point. Consequently, the Court will not consider Reliance's notice rationale. Because Reliance is barred from raising notice, and because all agree Mr. Ministeri satisfied all other conditions for portation, the Court concludes Mrs. Ministeri is entitled to recover supplemental life insurance benefits.

Even if Reliance were not barred from raising Mr. Ministeri's alleged failure to provide notice, the notice argument would fail. Reliance was obligated to inform Mr. Ministeri of his right to convert his policy "at least fifteen (15) days before the end of the [conversion period]," AR0016, during which time Mr. Ministeri was also entitled to port his supplemental benefits. Reliance never notified Mr. Ministeri that his continuation coverage was expiring and therefore failed to satisfy this obligation. True, Reliance did eventually mail Mr. Ministeri a portation application but only after his death, meaning notice was received by his wife. AR1981. Mrs. Ministeri may well have been precluded from invoking the portation provision by its terms, which allow an "Insured" to port "provided he/she notifies us in writing." AR0025 (emphasis added)). And in any event the portation window had already closed weeks before Reliance sent the application to Mrs. Ministeri, rendering this belated attempt to cure ineffective. Reliance never afforded Mr. Ministeri notice of his opportunity to port.

Reliance argues its error was inadvertent, explaining that AECOM dragged its feet when informing Reliance of Mr. Ministeri's change in status. Doc. No. 47 at 13. AECOM's alleged failings may offer Reliance a sword to wield against AECOM, but that sword is not a shield barring the claim for benefits from Mrs. Ministeri. Indeed, the Group Policy imposed on AECOM a record keeping and reporting requirement, and granted Reliance the right to inspect those records, because Reliance had the obligation to provide notice to the insureds. AR0012 ("[AECOM] must maintain records of all Insureds. . . . This information must be reported to us regularly. We reserve the right to examine [these records].")). And regardless, Reliance already knew of Mr. Ministeri's change in status long before his coverage expired. Its disability arm received Mr. Ministeri's LTD claim nearly a year before, in late 2014. AR0251. In approving his claim, the plan determined Mr. Ministeri's last day worked had been August 6, 2014. AR1445.[13] Reliance therefore knew—to the day—when Mr. Ministeri stopped working for AECOM and when his continuation coverage expired. Simply put, Reliance breached its obligation to Mr. Ministeri.

This raises the question of remedy. The Group Policy does not specify damages for Reliance's breach. Nor is this a circumstance where the ERISA statute itself provides a remedy.[14] The ERISA statute does, however, grant federal courts "a range of remedial powers" to remedy violations by insurers, Glista, 378 F.3d at 131, including the ability to award "appropriate equitable relief," id. (quoting 29 U.S.C. § 1132(a)). Among ERISA's grant of equitable powers is

---

[13] Mr. Ministeri's disability claim was approved upon the finding his last day worked was August 6, 2014. AR1445. Reliance only revisited this conclusion when assessing Mrs. Ministeri's life insurance benefit claim, changing course and finding that Mr. Ministeri's last day worked was May 2, 2014. Doc. No. 33-10 at 4.

[14] This distinguishes Mrs. Ministeri's case from those where an ERISA plaintiff seeks equitable relief for violations of the ERISA statute's notice requirements. See Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 112–114 (1st Cir. 2002) (explaining equitable relief is not commonly available in such circumstances).

the authority to bar an insurer from raising a potential defense, where warranted. See id. at 132 (doing so). And the First Circuit has indicated similar relief may be appropriate in a closely related context, when ERISA insurers fail to "inform beneficiaries of material facts about the plan." Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 115 (1st Cir. 2002) (discussing fiduciary disclosure obligations rather than, as here, plan-imposed disclosure obligations).

Based on the unusual facts of this case, the Court concludes the appropriate remedy for Reliance's failure to provide notice is to bar it from raising Mr. Ministeri's alleged failure to do the same. The following factors support the Court's ruling. First, Mr. Ministeri and Reliance had an unusually close relationship due to Mr. Ministeri's disability claim, meaning Reliance knew or should have known Mr. Ministeri continued to pay premiums despite the expiration of his coverage. Second, Mr. Ministeri's continued payment of premiums indicates he intended to continue coverage and it is reasonable to infer he would have timely ported his life insurance if warned, given his unfortunate medical prognosis. Third, there is a direct relationship between Reliance's breach and the argument they now offer: by all appearances, Reliance seeks to benefit from its own failing. Fourth, it is not possible to craft a more precise remedy, such as one returning the parties to the status quo; even if Mrs. Ministeri were given the opportunity to make an election on her husband's behalf, she would now do so with foreknowledge of the consequences of that decision. Finally, Reliance's argument only points to a technical failing on the part of Mr. Ministeri—all agree he continued to pay premiums and meet all other criteria for coverage. Barring Reliance's argument does not create an economic windfall for the Plaintiff.

In sum, Reliance failed to warn Mr. Ministeri he needed to file notice of his intent to port, despite having an obligation to do so and despite knowing the likely implications for Mr. Ministeri's coverage if it did not. When Mrs. Ministeri submitted her claim for her husband's life

insurance, Reliance noted in the claim file that no notice had been received but sat on this information rather than disclosing it as required by ERISA. Then, following half a decade of discussion and litigation, Reliance revealed this new rationale after Mrs. Ministeri had committed to her litigation strategy. Reliance's conduct with regard to this argument falls below the standard ERISA sets for insurers, and the Court consequently bars Reliance from relying on it.

        *2.*     *Reliance's Portability Cap Rationale Fails on the Merits*

Reliance further argues that even if Mrs. Ministeri may recover under the portability provision, the terms of that provision prohibit her from using it to recover more than $500,000 in total—barring her, in effect, from recovering any supplemental insurance given the size of her basic life award. As above, Reliance failed to raise this rationale in its initial and final denial letters but did include it in its briefs. Barring Reliance from raising this defense is unwarranted. It is generally only appropriate to bar a post-determination defense "when the lack of notice resulted in prejudice to the insured." Martinez, 948 F.3d at 68. Here, Reliance raises a traditional contract interpretation question—a question of law—to which Mrs. Ministeri had a full opportunity to respond. Given the lack of prejudice to Mrs. Ministeri, the Court will entertain Reliance's new argument.

The Group Policy states the "amount of Supplemental Insurance coverage available under the Portability provision will be the current amount of coverage" the insured carried on their last day of work. AR0025. It continues: "However, the amount of coverage will never be more than . . . a total of $500,000 from all [Reliance] group life and accidental death and dismemberment insurance combined." Id.

Reliance argues this should be read as establishing a limit on the amount an insured can

recover through the portability provision, such that the provision can never be used to recover more than $500,000 in total from Reliance. Because Mrs. Ministeri is already entitled to more than $500,000 by virtue of the conversion provision, she is (according to Reliance) unable to recover anything more under the portability provision.

Taking each sentence separately, the first states the "amount of Supplemental Insurance coverage available under the portability provision will be the current amount of coverage" held by the insured on their last day of work. AR0025 (emphasis added). The second sentence qualifies the first, explaining: "However, the amount of coverage" may not exceed $500,000. Id. Together, the quoted sentences mean the amount of supplemental insurance available under the portability provision will be the total amount of supplemental insurance held on the insured's last day worked, provided that the amount of such coverage available under the provision may never exceed $500,000. They do not, as Reliance argues, establish a cap on total recovery.

It is true the second sentence uses broad language, limiting the "amount of coverage" to a "total of $500,000 from all [Reliance] group life and accidental death and dismemberment insurance combined." AR0025 (emphasis added). But it must be remembered that this second sentence begins "However," indicating it is intended to act as a limitation on the preceding sentence rather than applying to the Group Policy as a whole. Indeed, were it interpreted as applying more broadly than it would seem to prohibit any recovery against Reliance exceeding $500,000. Not only would such an interpretation defeat the reasonable expectations of the insured, but it would also conflict with the first page of the Group Policy, which establishes a $2,000,000 cap on basic life insurance coverage—much higher than the $500,000 cap set here. AR0007. The better reading is that the second sentence limits the amount of coverage available through the portability provision to a total of $500,000 from all supplemental life, supplemental

34

accidental death, and supplemental dismemberment insurance combined. Because Mrs. Ministeri's supplemental life insurance claim is less than $500,000, this provision is no bar to her recovery.

As Reliance's notice rationale is barred and its portability cap rationale fails on the merits, Mrs. Ministeri is entitled to recover the proceeds of her husband's supplemental life insurance coverage.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court ALLOWS Mrs. Ministeri's Motion for Summary Judgment (Doc. No. 31) and DENIES Reliance's Cross Motion for Summary Judgment (Doc. No. 34). Judgment shall issue accordingly.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge